(No. 27277.— )
IN RE GILBERT NELSON, Attorney, Respondent.

*Opinion filed Nov. 16, 1943—Rehearing denied Jan. 13, 1944.*

CHARLES LEVITON, of Chicago, *amicus curiae.*

GILBERT NELSON, of Chicago, *pro se.*

Mr. CHIEF JUSTICE SMITH delivered the opinion of the court:

This case originated in a complaint filed by Morris Kozer with the Grievance Committee of the Chicago Bar Association. The complaint charged respondent, Gilbert Nelson, with unprofessional conduct as an attorney. The evidence is voluminous. The record contains over seven hundred pages of testimony. After prolonged hearings, a report was filed in this court by the committee, as commissioners of this court. The report recommended that respondent's name be stricken from the roll of attorneys. Respondent has brought the record here for review, in accordance with Rule 59.

The record is such that a somewhat extended review of the facts is indispensable to an understanding of the case. The transaction involved and the testimony concerning it, can be more accurately appraised if we keep in mind that the credible evidence in the record tends to

show that the property was vacant and was located far out in the country; that it was not worth to exceed $700, free and clear of all taxes and other liens; that the unpaid delinquent taxes and special assessments against it were more than $1000.

Respondent was admitted to the bar of this court on October 16, 1924. The evidence in the record discloses that sometime prior to the year 1938, one Samuel Miller had a transaction with Mrs. Agnes Yelverton involving an exchange of properties, one of which was located in Niles Center. At the time of this transaction with Mrs. Yelverton, Miller was a licensed real-estate broker. He did not, however, renew his license as such broker after the year 1936. Since sometime during the year 1935, Miller was employed as a liquor salesman. The record discloses further that after the transaction between Miller and Mrs. Yelverton was closed, she learned that the property which she received in the transaction was of little or no value. After this discovery, she was evidently pressing Miller to take the property off her hands, or to sell it to someone so she could realize, in part, at least, the amount she had invested in it. The record indicates that she was pressing him to right what she deemed a fraud which he perpetrated upon her in the transaction.

Early in 1938 Miller approached Kozer and sought to interest him in the purchase of the property. This conversation occurred in the back room of Kozer's tavern. Miller represented to Kozer that he could purchase the property for $7500 and that he could immediately resell it for $15,000; that there would be $7500 profit in the deal; $2500 of which would go to Kozer, $2500 to Miller and $2500 to respondent; that respondent had a client who was ready to purchase the property for $15,000. Miller further told Kozer in this conversation that respondent had in his possession, the check of his

client for $2500, with which to make an initial payment
on the purchase of the property from Mrs. Yelverton;
that respondent had a contract signed by his client to
purchase the property; that Miller had seen the check
and the contract. Following this conversation, Miller,
respondent and one Marco, accompanied Kozer to Niles
Center to examine the property. Miller had known re-
spondent for some seventeen or eighteen years. After
some further negotiations with Miller and respondent,
Kozer signed a contract to purchase the property for
$7500. He paid to Miller $1000 as a down payment.

Later, a meeting was arranged by Miller at the office
of Nathanson & Bernstein, who were Kozer's attorneys.
That meeting was attended by Kozer, Miller and respond-
ent, together with Kozer's attorneys, Maurice J. Nathan-
son and Sidney Bernstein. At that meeting respondent
assured them that he had a client who would purchase
the property for $15,000 cash. On demand of Nathan-
son he declined to disclose the name of his client but
asserted that he had his client's check for $2500, which
was to be used as a deposit for his client on the purchase
price of the property. Nathanson stated to Nelson and
Miller that his client, Kozer, had entered into a contract
with Miller for the purchase of the property; that Kozer
had deposited $1000 earnest money, and that he was then
ready to convey the property to Nelson's principal, ac-
cording to the contract. He requested respondent to sub-
mit the contract of his client and to deliver the check
for $2500 as earnest money. To this, respondent replied
that he did not have the check with him; that he had the
check, but it was not certified; that he had had it for
some time and that he would have to go back to his
principal to get a new check, which he could have cer-
tified. He agreed to deliver the check within the next
two days. Nathanson expressed the opinion that the
whole scheme was a fraud and that Kozer had been vic-

timized by Miller and respondent. He advised Kozer to have no further dealings with them and to take no further steps with reference to the purchase of the property. Bernstein expressed the same opinion in respondent's presence. As a result of this, a somewhat heated argument ensued between Nathanson and respondent, in which Nathanson charged that respondent was not acting in the best interest of his alleged client, and challenged the statement of respondent that he had a contract and the check of his client. Thereupon, Nelson left the office. It appears that Nathanson was leaving for a vacation. Before doing so, he advised Kozer definitely not to attempt to close the deal in his absence. He suggested to Kozer also, that it might be better for him to forfeit his $1000, deposited as earnest money with Miller, than to attempt to go through with the deal.

After Nathanson left on his vacation, however, Kozer was induced by Miller and respondent to go ahead with the transaction. During the time of the negotiations, when Kozer evidenced a disposition not to go through with the deal, respondent offered to pay $1000 of the purchase price himself, if Kozer would complete the transaction. Later respondent reported to Kozer that he could not raise $1000, but offered to give Kozer his note for that amount. The deal was finally closed in the office of Mrs. Yelverton's attorney.

The contract which Kozer had signed for the purchase of the property, called for a total payment of $7500 to Mrs. Yelverton. The $1000 paid to Miller by Kozer was turned over to Mrs. Yelverton's attorney, by Miller, prior to the day on which the transaction was closed. In closing the transaction, Kozer paid an additional $4500. At the same time, Miller delivered his check to Mrs. Yelverton's attorney for $1000. These items, when added to the sum of $1000, which was the amount allowed to Kozer on the purchase price because

of delinquent taxes and special assessments outstanding against the property, made up the full purchase price of $7500. Immediately after the transaction between Kozer and Mrs. Yelverton was closed, her attorney, by her direction, returned to Miller his check for $1000. She also directed her attorney to pay to Miller the sum of $1248.73 out of the money which was paid by Kozer. This reduced the amount which she received, to $4251.27. The $251.27 was used to pay the expenses of drawing the papers, title opinion, title policy and revenue stamps, leaving to Mrs. Yelverton the net sum of $4000. It is established by the evidence that this was in accordance with a previous secret agreement which Miller had entered into with Mrs. Yelverton, under which he was to receive back from her, all she received from the sale of the property in excess of $4000. Kozer had no knowledge that Mrs. Yelverton had returned Miller's check to him, or that she had paid over to Miller a part of the purchase money paid by Kozer.

This transaction was closed in August, 1938. Immediately thereafter, Miller reported to Kozer that he had gone on a vacation and would be absent for several weeks. Thereupon, Kozer attempted to locate respondent, but was unsuccessful. Miller returned in about a month. He reported to Kozer that everything in regard to the transaction with respondent's client was working out, but that a complication had arisen; that his client could not complete the deal unless a loan could be obtained on the property. Kozer finally located respondent in a barber shop. He told Kozer practically the same story that Miller had told him about the difficulty his client was having in obtaining a loan on the property. He assured Kozer, however, that the deal was going through, but would take a little time to enable his client to raise the money. Later Kozer had a conversation with Miller in the presence of Nathanson, one of Kozer's

attorneys. At that time, Miller offered to pay to Kozer one half of the purchase price which Kozer had paid, if Kozer would deed a one-half interest in the property to him. Kozer agreed to do this. Nathanson prepared a contract covering such agreement. It was not executed. Miller left the attorney's office, taking the unexecuted instrument with him. Thereafter, Kozer was unable to get in touch with either Miller or respondent. He then filed the complaint in this cause with the Grievance Committee.

On the hearings before the Grievance Committee, respondent testified that a man by the name of Burke approached him in February, 1938, and inquired of respondent if he knew where he could purchase a piece of property in Niles Center or Morton Grove; that he agreed with Burke to try to locate such a property; that he then got in touch with Miller; that he introduced Miller to Burke; that later Miller told him that he had an appointment with Burke's partner to go out and examine the property. He requested respondent to accompany them; that several hours later Miller called on respondent, accompanied by a man by the name of Marco; that prior to that time Burke had told respondent that Marco was his partner. Respondent accompanied Miller, Marco and Kozer to look at the property; that about March 17, 1938, Burke reported to respondent that they had agreed on the price; that Miller then came to the office and respondent drew the contract, which Burke signed at that time; that Miller then took the contract for the purpose of obtaining the signature of Marco; that the contract and a check for $2500 were delivered to Miller; that respondent went with Miller to get Kozer to sign the contract; that until sometime in April Burke and Marco had called him at various times to inquire what was holding up the deal. After that the matter was obviously somewhat dormant until sometime

in June. He further testified that Marco finally asked him to return the check and contract; that Marco later told him that the check and contract had been returned to him. This was the last of June or the first of July. He denied the testimony of Kozer, Nathanson and Bernstein as to what occurred in Nathanson's office. He insisted that he was acting only for Burke and Marco in the transaction involving the purchase of the property.

Miller testified that the contract drawn by respondent had two signatures thereon, one of which was Marco's; that Miller received a certified check for $2500 at the time the contract was drawn, which was handed to him, either by Marco or his associate, in the presence of respondent; that Miller kept the contract and check in his possession for four or five months and then tore the signatures off the instruments; that he returned the contract and check to Marco and Burke a few days after the deal was closed with Mrs. Yelverton.

After hearing much other testimony, the commissioners filed their report with the Board of Managers, recommending respondent's disbarment. After this report was filed, respondent entered into a written contract with Kozer to purchase a one-half interest in the property for $2750. He paid to Kozer $500 cash and obligated himself to pay the remaining $2250 in one installment of $750, and three installments of $500 each. Neither of these installments was ever paid by respondent. He later testified, after the case was reopened, that the consideration for this contract to purchase a one-half interest in the property, was that Kozer was to "tell the Committee I was innocent of any wrong doing in any manner, shape or form, about my deal with Miller or anybody else." He further testified that Miller gave him the $500 paid to Kozer as the down payment and that Miller had agreed to reimburse him for any further payments made by him under the contract. He admitted that he con-

cealed this transaction from the attorney representing him in this proceeding.

Thereafter, respondent filed a petition in the cause requesting the commissioners to reopen the case, and to hear further testimony. In this petition he alleged that he had just learned that one Henry Goldstone was the undisclosed principal of Burke and Marco, who desired to purchase the property; that subsequent to the filing of the commissioners' report, Kozer and Goldstone had entered into a contract from which these facts were disclosed; that he was then able, for the first time, to advise the Board of Managers and the Grievance Committee, of said facts. He asked that the cause be reopened and further evidence heard. To this petition was attached the affidavit of Henry Goldstone, in which he claimed to be the real proposed purchaser of the property, operating through Marco, Burke and respondent; that he furnished the $2500 check which was in the possession of respondent; that the purchase was not completed only because Goldstone was compelled to leave the city; that he had recently heard that Marco and Burke had retained respondent to arrange for the purchase of the property; that they were acting on his behalf and that by reason of Goldstone's removal from the city, and his withdrawal of the $2500 check, respondent was not able to complete the transaction. He further stated that about the first of September, 1942, he learned that respondent was in trouble over the transaction; that on September 17, 1942, he went to the office of Kozer's attorney and entered into a contract with Kozer to take the property off his hands; that the contract was signed by him and Kozer, in which he agreed to purchase the property for $5500; that he paid $2500 on account and agreed to pay the balance within six months thereafter.

There was also attached to respondent's petition to reopen the case, the affidavits of Kozer and Philip R.

Davis, his attorney, with reference to the purchase of the property by Goldstone from Kozer, after the report had been filed.

The petition to reopen the case was allowed and Goldstone was called as a witness by respondent. He testified in his examination in chief, that the $2500 check which was in the possession of respondent, in connection with the deal,. was a cashier's check, procured by him from his bank. He further testified that the check was afterwards returned to him. On cross-examination he was positive that he procured the cashier's check from the bank himself, paying cash therefor; that Burke was employed by him around his cafe as a private secretary. He further testified that he did not know Marco and never had anything to do with him; that he did not know respondent until after the transaction here involved. It was later shown by an officer, and by the records of the bank, which Goldstone testified issued the cashier's check, that no such check was issued at any time to Goldstone. Goldstone was then recalled and testified, "When I testified at the previous hearing that I was positive that I got the cashier's check back from the bank for the $2500 which I sent, I meant that I gave Burke the money and told him to get the cashier's check, and I assumed that he had gotten it. I just took it for granted that he had it." He also changed his testimony concerning the return of the check to him by Burke, and in many other respects. He stated on cross-examination that he. was not sure whether it was cash or a cashier's check which Burke returned to him. He exhibited a willingness to change his testimony in any respect every time anyone suggested a discrepancy or that his prior statements were untrue. In this manner, he was apparently both able and willing to accommodate himself to any situation or emergency which might arise, to enable him to carry out the role which he had voluntarily assumed for the purpose

of assisting respondent, who was a total stranger to him, in making his defense.

Based upon the testimony of respondent in the hearings before the case was reopened, his theory of the transaction was that Miller originated the transaction; that Miller enlisted his services for the purpose of finding a piece of property in Niles Center, which Miller was trying to locate for Kozer, and that Kozer was the moving factor in the transaction. In this, he was corroborated to some extent by Miller. As to Miller, it may be further observed that in his testimony, when first called as a witness, he stated positively that he never received any part of the consideration paid to Mrs. Yelverton, and that Nelson "never got a nickel" out of that consideration. A few days later, however, he made a statement in the office of Philip R. Davis, in which he repudiated this testimony, and admitted that he received more than $400 himself, and that respondent and respondent's brother received some $800. In this statement he further stated that his reason for testifying falsely concerning such transaction, when a witness before the commissioners, was to protect respondent from disbarment. In this statement he repudiated other portions of his testimony given before the commissioners a few days previous. Later he was again recalled as a witness by the commissioners. In his examination he told still a different story and repudiated some of the testimony he had theretofore given, as well as some of the statements made by him in Davis's office. His testimony given before the case was reopened, his statement made in the office of attorney Davis, and his testimony given after the case was reopened, are so irreconcilable that, when considered together, they are so contradictory that they are positively incoherent. The same may be said of Goldstone. The testimony given by him when he was first placed on the stand was, in many important re-

spects, repudiated by him when he was recalled, after it had been established by the bank officer and bank records that his testimony concerning the cashier's check was false. He was not only successfully impeached by the officer and the records of the bank, but by his own testimony. To ask anyone to believe his fanciful story that, although he did not know respondent, after he heard he was in trouble he volunteered to assume the role of purchaser of the property and did purchase it from Kozer, during the pendency of the proceedings, for the purpose of assisting respondent, is too great a tax upon human credulity. Yet, Goldstone testified that he purchased the property from Kozer, while the proceedings were pending, for $5500, paying $2500 in cash and entering into a contract to pay the balance within six months.

The record indicates definitely that Goldstone's appearance in this case was an afterthought; that he was brought forward by respondent, as a mysterious undisclosed purchaser of the property, in an attempt, by respondent, to cover up his connection with the transaction and make it sound plausible. From Goldstone's testimony, alone, the commissioners were amply justified in concluding that he was wholly discredited; that his testimony was a pure fabrication and unworthy of belief. All the testimony of Goldstone added to the case was to place respondent in the position of adding subornation of perjury to his already unenviable connection with a transaction which was odorous in its inception and reprehensible in its purpose.

No one can read this record without being forced to the conclusion that respondent and Miller entered into a conspiracy having for its object a fraudulent purpose. Whether the purpose was to defraud Kozer or to defraud some undisclosed client of respondent, makes no

difference in this case. If the purpose of the conspiracy was to defraud Kozer, their conduct was reprehensible. If the purpose was to defraud a client of respondent, whoever he may have been, the result would be the same. If respondent was handling business for any client in the manner in which he testified he attempted to handle this transaction, it would constitute such conduct that his name should be stricken from the roll of attorneys.

In presenting this case before the commissioners, before it was reopened, he presented the fantastic theory that he was representing a client who desired to purchase the property; that such client had given him carte blanche authority to purchase any piece of property he might select, of any value, in the vicinity of Niles Center or Morton Grove, and to pay $15,000 therefor; that the client gave him $2500 in the form of a certified check to enable him to make a down payment, and to enter into a binding contract to pay the balance. The story does not carry conviction. It is too fantastic for any practical purpose. After the evidence was in and Miller had repudiated a part of his testimony, respondent changed his theory and brought Goldstone into the picture. It is obvious that the true facts were never disclosed, either by respondent, Miller or Goldstone. Regardless of what theory might be adopted as to the transaction involved, it is established by the evidence, beyond any question, that respondent and Miller entered into a conspiracy to cheat and defraud whomsoever they might be able to enmesh within their fraudulent purpose.

The conduct of respondent in connection with the transaction, as well as his attempt to bribe Kozer to change his testimony, which seems to have been, at least, partially successful, and his projection of Goldstone into the case to give false testimony, was unbecoming a member of the bar. It was such as to bring the profession

42

into disrepute. It involved the vilest moral turpitude. The commissioners were amply justified in their findings, and their recommendation is supported by the record.

The report and recommendation of the commissioners is, in all respects, approved. Respondent's name is stricken from the roll of attorneys of this court.

*Respondent disbarred.*